SUPREME JUDICIAL COURT                                   Reporter of Decisions
Decision:     2018 ME 79
Docket:       And-17-370
Submitted
  On Briefs:  April 12, 2018
Decided:      June 19, 2018

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

## IN RE CHILD OF EMILY K.

PER CURIAM

[¶1]  Emily K. appeals from a judgment entered by the District Court (Lewiston, *Ende, J.*) terminating her parental rights to her child.  The mother argues that the court erred in determining that the termination of her parental rights was in the child's best interest when the child was placed in a permanency guardianship with his paternal grandparents and his father's parental rights were not terminated.  We affirm the judgment.

### I.  BACKGROUND

[¶2]  In December 2015, the court (*Oram, J.*) entered a preliminary protection order placing the child in the custody of the Department of Health and Human Services upon allegations that the child's mother threatened suicide in his presence and took steps to avoid contact with the Department, which had been assisting her in obtaining substance abuse and mental health treatment.  The Department filed a petition for a child protection order at that

2

time, and the court (*Dow, J.*) entered an order after the mother waived the opportunity for a summary preliminary hearing on January 8, 2016, retaining custody with the Department. The child was placed with his paternal grandparents and has remained in their care ever since.

[¶3] The mother agreed to the entry of a jeopardy order in February 2016 and the father agreed to the entry of a jeopardy order one month later. Following judicial review and permanency planning hearings held in July and December 2016, the Department petitioned for termination of both parents' parental rights in January 2017. After pretrial case management and unavoidable continuances, the court (*Ende, J.*) held a hearing on the petition to terminate the mother's parental rights in June 2017. The court entered a judgment terminating her parental rights on August 14, 2017, in part based on the grandparents' availability and willingness to adopt the child. The mother timely appealed on August 28, 2017. *See* 22 M.R.S. § 4006 (2017); M.R. App. P. 2 (Tower 2016).[2]

[¶4] The Department withdrew the petition to terminate the parental rights of the father on September 7, 2017. The mother moved for us to authorize additional process in the trial court so that she could move for relief

---

[2] Because the appeal was commenced before September 1, 2017, the restyled Maine Rules of Appellate procedure do not apply. *See* M.R. App. P. 1 (restyled).

from judgment based on the Department's withdrawal of the petition as to the father. We authorized the trial court to act and stayed the appeal until a court ruling could be reached on the mother's anticipated motion for relief from judgment.

[¶5] The trial court (*Dow, J.*) ultimately ordered, with the father's consent, that the child would be placed in a permanency guardianship with the child's paternal grandparents. *See* 22 M.R.S. § 4038-C (2017). Because of the change in the permanency plan from adoption to permanency guardianship and the father's retention of his parental rights, the mother moved for relief from the judgment entered against her and sought to reopen the record so that the court could reconsider whether her rights should be terminated. The court (*Ende, J.*) granted the motion to reopen the record. The Department, joined by the mother, moved to stay the appeal pending the new hearing, and we granted that motion.

[¶6] On November 20, 2017, the court held a hearing and took additional evidence. After hearing that evidence, the court entered the judgment now on appeal terminating the mother's parental rights. The court found, by clear and convincing evidence, the following facts, all of which are supported by

competent evidence in the record. *See In re Aurora M.*, 2018 ME 4, ¶ 2, 177 A.3d 617.

> [The child] came into Departmental custody on or about December 17, 2015, at a time when [the mother] threatened suicide in [the child]'s presence, while she continued to evade DHHS, continued to use drugs and to display unregulated mental health symptoms, which violated a December 1, 2015 Safety Plan in which she had agreed to get mental health and substance abuse treatment and submit to random drug tests at DHHS request. A Jeopardy Order was entered against the Mother on February 22, 2016, after she waived her right to a contested hearing on the issue of jeopardy. Jeopardy Findings relating to the Mother were as follows:
>
>> [The child] is at risk for serious physical harm, serious emotional harm and/or serious neglect based on his mother's substance abuse, untreated mental health issues, exposure of [the child] to unsafe people and chronic unsafe/unstable housing. [The mother] has been diagnosed in the past with bipolar disorder, depression, PTSD, and anxiety disorder but has failed to maintain recommended treatment. [The mother]'s mental health concerns have led to her expressing her suicidal ideation in front of her young son. Due to the unstable lifestyle and chronic homelessness [the child] has spent nights sleeping in his mother's car, or in hotel rooms, at times sharing these spaces with strangers that were unsafe.
>>
>> Since coming into the care of the Department of Health and Human Services [the child] has expressed that he is afraid of the "bad guys" and that he feels safe at his grandparent's because they keep the "bad guys" away.
>>
>> [The mother] has engaged in individual counseling . . . ; however, her attendance has been inconsistent. [The mother] did begin an Intensive Outpatient Program . . . but

her attendance in that program was also inconsistent. At the end of January 2016, she skipped out of lOP when learning she would be drug tested and that coupled with her inconsistent attendance resulted in her discharge from the program. On January 29, 2016, [the mother] volunteered to attend the Family Treatment Drug Court. Her attendance in that program has been inconsistent and the two drug tests she has completed have shown positive for: cocaine, opiates and marijuana.

[The mother] was set up for drugs screenings by the Department of Health and Human services beginning in mid-December of 2016 and she has never attended any of those drug screenings. DHHS suspended the services on February 16th due to lack of attendance. [The mother] was arrested on February 5, 2015 by the Auburn Police Department for two theft charges[;] she was not released from custody until on or about February 9th. Due to her incarceration she missed a visit with her son. [The mother] was arrested again for theft and violation of her conditions of release by the Auburn Police Department on February 14, 2016 and she was released [on] or about February 16th.

[The mother] has been consistent in attending her visits with [the child] when she is not incarcerated . . . . [The mother] is not consistent in communicating with DHHS. As of the date of this order, DHHS does not have a working phone number or an address for [the mother].

Jeopardy Order as to Mother, dated February 22, 2016.

The evidence from both the June [29], 2017 and the November 20, 2017 hearings showed that [the child] was attached to his mother when he first came into Departmental custody approximately two years ago, although he was traumatized by his mother's exposing him to unsafe individuals and unsafe and unstable housing. He has trouble putting clothes over his head, according to [the child], because someone with whom he was left put a pillow or bag over

his head, so he couldn't see or breathe.  He is diagnosed with Post Traumatic Stress Disorder, according to [his counselor].  His paternal grandmother . . . credibly testified about the progress [the child] has made, since his mother has been out of his life.  When he first arrived, [the child] was filled with anger, and he would hit children at school.  [The child] had nightmares and "bad night sweats" when he first came to [the grandmother]'s home, approximately two years ago.  He told [the grandmother] that he had lots of bad secrets.  He initially refused to go [to] a Christmas Eve visit with his mom in 2015, but was talked into it.

His chronic nightmares continued until he stopped having regular contact with his mother.  He stated numerous times that he does not want to see his mother.  When his dad recently started visiting him, he became afraid that his mom will come with bad guys and take him from his dad's.  As lately as November 19, 2017, he had a bad dream that his mom came in a car with bad guys to take him with them.  He has consistently and, initially, frequently expressed that he was very happy in [the grandmother]'s home and wished to remain there.  When saying grace at dinner, he was thankful for food—and so much of it—and having a home and his own bed, things he previously didn't have.

It has been 14 months since [the mother] has seen [the child].  She recently sent a Happy Birthday letter to him for his 7th birthday, but [the grandmother] did not show it to him, for fear of upsetting him.  She also sent a letter[3] to [the grandmother] in October 2017, asking to be allowed to take [the child] to the new Justice League movie.  The last time [the mother] called [the grandmother]'s home, [the mother] left a message that stated she had called [the grandmother]'s house and someone drunk answered, and [the mother] told that person [the child]'s full name, social security number and date of birth.  This gave [the grandmother] pause, because she believed [the mother] might have given that sensitive information to some stranger that she had called by mistake.

---

[3]  The letters were apparently sent from a county jail, according to [the grandmother].

The Department attempted to have [the mother] engage in services that would help her reunify with [the child]. Over an almost two-year period they offered supportive services. [The mother] twice participated in Family Treatment Drug Court, but was discharged for violating the rules. [The mother] started FTDC in January 2016, and she was discharged in either February or March 2016. The second time, [the mother] started in early October 2016, and she was terminated by FTDC effective November 21, 2016. As her attorney notes in her closing argument:

> By all accounts, [the mother] has contended with substance abuse and mental health issues for years, and perhaps even decades. Throughout the life of this case, she attempted a number of courses of treatment, including mental health and substance abuse counseling . . . , substance abuse treatment . . . , and participation in the Family Treatment Drug Court. Although [the mother] managed to maintain sobriety for a 52-day period, she was largely unsuccessful overall and likely remains in the throes of addiction today.

Mother Closing Argument, p. 1.

[The mother] successfully completed [a] Drug Treatment program from July to mid-August 2016. At a September 7, 2016 Family Team Meeting, [the mother] reported being drug-free for 52 days. Unfortunately, that was about her only success over the last two years. She began to skip appointments and miss visits with [the child]. She tested positive for drugs again in early October 201[6], and after she missed visits with [the child] on September 30, 201[6] and October 7, 201[6], her visitation rights were suspended on October 11, 201[6]. Her phone contact with [the child] was also suspended in January 2017. Her inconsistency in visiting would upset [the child]. In her phone calls, she was often inappropriate in conversation with [the child]. [The grandmother] cut calls short on a number of occasions, because [the mother] would tell [the child], for example, that she had no food and she hadn't eaten for three days, which would greatly upset [the child]. Another time she told [the child] that she had to sleep in a place where rats were

biting her fingers. She'd also, at times, inquire about [the child]'s dad and his girlfriend. [The mother] hadn't even called [the child] for the six weeks prior to the suspension of her phone rights.

The Court finds, by clear and convincing evidence, that custody of [the child] had been removed from the Mother, pursuant to 22 M.R.S. §§ 4035 and 4038. The court further finds that the Department has made reasonable efforts to rehabilitate and reunify the mother and child, and has made reasonable efforts to identify and pursue alternative permanency plans. The Department's reasonable efforts are evidenced by the State's Exhibits admitted in this case, and include safety planning, multiple referrals to mental health and substance abuse counseling, as well as two referrals to the Family Treatment Drug Court, drug screens, supervised visitation with the child, and transportation services. The child came into Departmental care on or about December 17, 2015, and now, effectively two years later, [the mother] is most likely still addicted to opioid drugs, her whereabouts are unknown, and she has made zero progress towards removing the barriers to reunification with the child.

The court **FINDS** that the Department has shown, by clear and convincing evidence:

1. that [the mother] is unwilling or unable to protect the child from jeopardy and that these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs, 22 M.R.S.[] § 4055[(1)(B)](2)(b)(i) [(2017)];
and

2. [the mother] has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs, 22 M.R.S.[] § 4055[(1)(B)](2)(b)(ii) [(2017)].

That leaves the court with the sole issue raised by [the mother]'s counsel, whether Termination of [the mother]'s parental Rights would be in [the child]'s best interest. The court had previously found that it would be in [the child]'s best interests in its August 3,

2017 TPR Order. However, adoption of [the child] was the permanency plan at that time, but it no longer is. A permanency Guardianship was established on October 12, 2017, with [the grandmother] and [the grandfather] being appointed as Permanent Guardians of their grandchild . . . . So, currently there is no legal necessity to terminate mother's rights as a legal prerequisite to this permanency plan. The mother argues that [the child]'s former therapist . . . , who testified that she supported terminating Mother's rights at this point, because "it has been two years and no progress made," also testified that it could be beneficial for [the child] to have a relationship with his mother as he got older, if it were "consistent, clear and actually occurs."[4] So, if termination is not legally required before institution of the permanency guardianship, and if it *might* be in [the child]'s best interest to have a relationship with [the mother] in the future, how can the Department show, or the court find, by clear and convincing evidence, that the current termination of [the mother]'s rights is in [the child]'s best interest?

The court was open to this reasoning and even joined in questioning witnesses about the need for termination. However, their responses were unanimous and forceful. [The child]'s life with [the mother] was so traumatic, that it adversely affects him to this day. The [guardian ad litem] . . . was unequivocal. She has met with [the child] at least every three months, during the pendency of this matter. She believed it would be "extremely traumatic" for [the child] to be forced to deal with his mother. When questioned what if he weren't "forced" and [the child] would have contact only if he desired it, she was again unequivocal. She thinks he needs to know he's not going to deal with her again, in order to move on. On cross by [the mother's counsel], [the GAL] asserted that [the child] should not feel there is any chance of contact with his mother.[5] The

---

[4]  The court interprets this as the following paraphrased answer: "yes, the relationship could be beneficial to [the child], if the relationship is consistent, and visits actually occur as expected."

[5]  [The GAL] also opined that [the child] could always seek her out. The court notes this is a possibility for either the Permanency Guardians [or] some other caretaker, if he, she or they feel [the child] could benefit from contact with his mother.

GAL expressed concern about the effects on [the child] of just having a conversation about possible contact with mom. The therapist . . . testified that she supported the termination of [the child]'s mother's rights. It had been two years and no progress had been made by mother. She further testified that [the mother] had limited insight into what [the child] had gone through, and that [the child] had suffered anxiety over missed visits and phone calls with his mother. [The therapist] believed that he needed some type of closure.

[The grandmother] also testified about the adverse effects on [the child] regarding the possibility of having contact with his mother. He never asks to have contact with her. As [the grandmother] and [the child] live their lives, he sometimes brings up his traumatic past. When shopping, he'll state "Please don't leave me in the car Grammy." He's mentioned bad guys he was left with. She testified that [the mother] took [the child] to a friend's house where someone's daughter molested him. She believes that [the child] has been so traumatized by his life with [the mother] that only the certainty that no contact can possibly occur gives him peace of mind. She saw that after she informed him of the August 3, 2017 TPR Order. He's doing so well now, in school and out of school, and she has no doubt that's because [the child] hasn't seen his mother for 14 months.

While [the mother]'s argument on best interest . . . is logical, it is made in the subjunctive mood. It is premised on what is wished, or on some future possibility, as opposed to the reality before the court. The mere possibility that [the mother] will get her act together and stop engaging in dangerous behavior, does not outweigh [the child]'s current need for certainty and closure. Right now, [the child] needs to know that he will never have to live with [the mother] again to put his mind at ease. Based on the record before[] it[,] the court **FINDS**, that the Department has met its burden of showing by clear and convincing evidence that it is in [the child]'s best interest to terminate [the mother]'s parental rights, notwithstanding that a permanency guardianship has been

established, and that there is not a current plan for adoption of [the child] . . . .

The mother's appeal from this final judgment is now before us.

## II. DISCUSSION

[¶7] Notwithstanding the court's thorough and careful evaluation of the child's best interest, the mother contends that, although she is not presently capable of caring for the child, her parental rights—like the father's—should not be terminated because the child is in a permanency guardianship and it could be in his interest to have contact with her in the future.

[¶8] The court appropriately reopened the record because the court's change in the child's permanency plan from adoption to permanency guardianship could affect the court's finding that the termination of the mother's parental rights was in the child's best interest. *See* 22 M.R.S. § 4055(1)(B)(2)(a) (2017). The court then heard additional evidence and reconsidered the child's best interest with respect to his mother.

[¶9] Although the establishment of a permanency guardianship is the product of a best interest determination, it does not prevent a finding that termination of an unfit parent's parental rights is in a child's best interest. *See In re Children of Nicole M.*, 2018 ME 75, ¶¶ 26-28, --- A.3d ---; *In re L.T.*, 2015 ME 94, ¶ 18 & n.5, 120 A.3d 650. Based on the evidence presented, and given the

mother's failure to appear at either termination hearing, the court found that the child, who experienced trauma while in his mother's care and suffered emotional harm when she failed to follow through with services and planned contact, needed to know that he was not going to return to the mother's home or continue to experience detrimental uncertainty about her. The court's decision not to terminate the father's parental rights is not inconsistent with the court's termination of the mother's parental rights given the evidence that the child is not distressed by the prospect of living with his father but is terrified of again being mistreated at the hands of his mother and her acquaintances.

[¶10] The mother's conduct toward the child caused him injury and trauma, and the court was persuaded that, even with a permanency guardianship in place, the child's best interest is served by the termination of the mother's parental rights. The court did not, on this record, err or abuse its discretion in finding unfitness and determining that termination of the mother's parental rights is in the child's best interest despite the establishment of a permanency guardianship and the father's retention of his parental rights. *See In re Children of Nicole M.*, 2018 ME --, ¶¶ 26-28, --- A.3d ---; *In re L.T.*, 2015 ME 94, ¶¶ 2-16, 18, 120 A.3d 650; *see also In re Marcus S.*, 2007 ME 24, ¶¶ 4, 9-11, 916 A.2d 225 (affirming the court's termination of a mother's parental

rights because her determination to regain custody and her threats to take the children would disrupt the stability of the children's permanency plan of reunification with their father).

The entry is:

Judgment affirmed.

---

Valerie A. Randall, Esq., Rioux, Donahue, Chmelecki & Peltier LLC, Portland, for appellant Mother

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Lewiston District Court docket number PC-2015-80
FOR CLERK REFERENCE ONLY